IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

ALAN DOERING                                                    PLAINTIFF

v.                          Civil No. 2:14-CV-02031-PKH-MEF

SHERIFF BILL HOLLENBECK, OFFICER                        DEFENDANTS
JOHN DEVANE, DR. WILLIAM HAYES,
NURSE CINDY MOORE, OFFICER JOHN
SCHUCH

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

This is a civil rights action filed by Plaintiff, Alan Doering, pursuant to 42 U.S.C. § 1983.

Plaintiff is currently incarcerated in the Arkansas Department of Corrections ("ADC") North

Central Unit.  Pursuant to the provisions of 28 U.S.C. § 636(b)(1) and (3)(2011), the Honorable P.

K. Holmes, III, Chief United States District Judge, referred this case to the undersigned for the

purpose of making a report and recommendation.

Currently before me is a Motion for Summary Judgment by Defendants Devane, Hayes,

Hollenbeck, Moore, and Schuch.[1]  (Doc. 64)  After careful consideration, the undersigned makes

the following Report and Recommendation.

---

[1] Service to Defendant Ana Bazaar was returned unexecuted on July 10, 2014.  (Doc. 27)
The Court entered an Order on September 9, 2014, directing Defendant to provide further
information on Defendant Bazar.  (Doc. 29)  Defendants responded on September 16, 2014,
indicating Defendant Bazar was no longer employed with the County, and they had provided all
known information concerning her.  (Doc. 39)  At his Summary Judgment hearing, Plaintiff
testified he had no means of searching for her address, and had no further information than that
already provided by Defendants.  As Defendants correctly argue in their Brief, the time for serving
Defendant Bazar is long past.

## I. BACKGROUND

Plaintiff's Complaint was filed on February 7, 2014, against John Doe Sheriff, John Doe Doctor, and Jane Doe Head Nurse, all of the Sebastian County Jail.  He alleges he was denied his life-saving HIV medication; taken to a rubber room, stripped naked, and put in a flak jacket; he did not have a mattress or any kind of blanket; he was given only cold bologna sandwiches to eat; and, he was in pain and not given pain medication.  (Doc. 2, pp. 5-7)  Plaintiff was booked into Sebastian County Jail in "August or September," 2012.  (Doc. 2, p. 5)  The Complaint was filed in the Eastern District of Arkansas and properly transferred to this District on February 11, 2014.  (Doc. 3)  Plaintiff proceeds against all Defendant in their official and personal capacities.  (Doc. 2, p. 3)  Plaintiff seeks monetary damages.  (Doc. 2, p. 7)

Plaintiff filed two Supplements to his Complaint on May 16, 2014. (Docs. 17, 18)  In Document 17, Plaintiff names the John Doe Defendants in his first Complaint, and adds several other Defendants.  These include John Devane, Dr. William Hayes, John Doe Mental Health Doctor Tim Grant, Nurse Cindy Moore, and Jane Doe Nurse Ana Bazar.  (Doc. 17, p. 1)  Plaintiff repeats the allegations of his first Complaint with greater detail.  He alleges he "never received any treatment at all and was refused medical services from Defendants Hollenbeck, Devane, Moore Grant, and Bazar on numerous occasions."  (Doc. 17, p. 2)  He characterizes the bologna sandwiches as "frozed" instead of cold.  He states he was told Defendant Moore ordered him placed in the rubber room because he was "bugging them to (sic) much."  He adds the allegation that Defendant Bazar came and saw him once, told him here was nothing wrong with him, and left laughing.  He adds the allegation that when he went to Court and told his attorney and Judge Cox about his treatment, the Judge told the prosecuting attorney to look into it.  He states he was

2

released from the rubber room the next day and went to the kiosk to tell Defendants Hollenbeck, Devane, Hayes, and Grant the problems he was having. After he used the kiosk, the "goon squad" came and took him to isolation where he could not use the kiosk machine. He alleges he was treated like a leper because of his HIV status. (Doc. 17, p. 2)

In Document 18, he renames Dr. William Hayes, John Devane, Cindy Moore and Ana Bazar. He also requests that his address be changed. He states he was booked in on August 10, 2012. In this Supplement, he alleges he was denied both HIV and cholesterol medication; that he was placed in a cell and not seen by any medical personnel; and, that after he started filing grievances, they took him to the rubber room, stripped him naked, and left him without a blanket or mattress. Upon asking why this was happening, he was told "the head nurse ordered it because of my trouble grievances." He alleges he was refused any access to grievances, phone, mail, legal help or medical treatment. He alleges he was fed ice-cold bologna sandwiches three times a day for weeks. He got sick, was in pain and having nightmares, and was scared for his life. (Doc. 18, p. 4)

Plaintiff filed another Supplement to his Complaint on September 11, 2014. (Doc. 35) In this Supplement, he names John Schuch, a deputy at the Sebastian County Jail, as an additional Defendant. Plaintiff alleges Defendant Schuch moved a disturbed inmate, Ed Baker, into the suicide cell with him. "This inmate was bleeding and acting crazy. He told me he was a rapist and he was going to rape me. He jumped up and grabbed me by the throat and tried to pull off my flak jacket which I was naked under it and very scared. I got loose from this inmate and started screaming for help banging on the door. When Inmate Ed Baker grabbed me he got blood in my mouth and now I have Hepatitis C which I believe came from him." (Doc. 35, p. 3)

3

A Report and Recommendation was entered on July 17, 2015, recommending the dismissal of Defendant Grant.  (Doc. 56)  The Report and Recommendation was adopted on August 19, 2015.  (Doc. 58)

On November 23, 2015, Plaintiff filed a Motion to Amend his Complaint.  (Doc. 63)  This Motion was denied as untimely and filed with dilatory motive (Doc. 84), and the content of that Motion was not considered in this Report.

Defendants filed their Motion for Summary Judgment on December 4, 2015.  (Doc. 64)

A Summary Judgment hearing was held on January 19, 2016, to permit Plaintiff to respond orally to the Motion.  Prior to the hearing, Plaintiff objected to appearing by videoconference. (Doc. 69)  Plaintiff alleged he had numerous documents and could not afford to make copies of them.  He further alleged appearing by videoconference would place "undue stress and pressure" on him, and would hinder his right to properly challenge Defendants' Motion for Summary Judgment.  His request to appear in person was granted (Doc. 70), and Plaintiff did appear and testify in person.  Instead of the "numerous exhibits" he referred to in his objection to the video conference, Plaintiff brought one five-page exhibit with him to submit to the Court.  Copies of this exhibit were made available to Defense counsel.  The hearing exhibit summarized Plaintiff's arguments as to each Defendant, and was accepted by the Court.  (Doc. 81)

At the summary judgment hearing, the Court summarized Plaintiff's claims as listed above. Plaintiff agreed the summaries were correct, with the exception of his booking date into SCDC. Plaintiff testified he was booked into SCDC on August 9, 2012, not August 10, 2012, as listed in his Document 18.

The Court asked Plaintiff to testify as to his claims against each Defendant.  Plaintiff

testified Defendant Hollenbeck never personally responded to any of his grievances.  Plaintiff testified the policies state the Sheriff is to respond to grievances, therefore he is personally involved in the grievance policy.  Plaintiff further testified that the Sheriff is personally responsible for policies, which he delegates to officers to carry out.

When asked what proof he had that Defendant Devane authorized Ed Baker to be released into the suicide cell with him, Plaintiff stated, "I believe it was the policies."  When asked again how this showed Defendant Devane approved this, Plaintiff stated: "I can't say he ordered it, but I contend that he knew and approved of it through the policy.  He was informed and did not stop it. He should have looked at my file and Baker's file.  I was supposed to be kept separate."  He testified the booking papers showed Ed Baker was irrational at booking.  When asked how Defendant Devane knew of an excessive risk to Plaintiff from Baker, Plaintiff again pointed to Baker's booking sheet, which he provided as Plaintiff's Exhibit 44.  (Doc. 73, pp. 65-66)

Regarding Defendant Schuch, Plaintiff testified he saw him lead Ed Baker into the cell and lock him in.  Plaintiff testified that Schuch removed Baker when Plaintiff complained about him. Plaintiff testified Baker was only in the cell with him for maybe three to four minutes before the alleged aggression occurred.  Plaintiff testified he was not sure how long Baker was in the cell, "[i]t seemed like forever…maybe five to eight minutes."  Plaintiff testified Baker was huddled on the rubber bench in the cell crying while Plaintiff was banging on the door and calling for help. Plaintiff testified Baker was off the bench and threatening him again when the officers came to remove him.  As proof of this, Plaintiff referenced his Exhibit 46, and pointed out the language "threatening cell mate."  (Doc. 73, p. 67)  When asked how Schuch knew Baker was dangerous, he again referenced Baker's booking sheet.  Plaintiff also alleged Defendant Schuch never filed a report against Baker.

Regarding Defendant Dr. Hayes, Plaintiff testified Hayes' notes on September 14, 2012, indicated Plaintiff was complaining of pain and anxiety; however, Defendant Hayes never gave him anything for his neuropathy pain.  Plaintiff testified Hayes gave him Paxil and continued his HIV medication, but "he never got anything for pain until the ADC."  This was his sole complaint against Defendant Hayes.

Regarding Defendant Nurse Moore, Plaintiff testified he was booked into Sebastian County on August 9, 2012, and was incarcerated there until October 22, 2012, when he was transferred to the ADC.  He testified he started his HIV medication on August 23, 2012.  Plaintiff was asked if he suffered any physical harm as a result of not getting his HIV medication between August 9, 2012, and August 23, 2013.  Plaintiff testified his CD4 count was lower, and "you get resistant to the HIV drugs if you don't take them."  Plaintiff testified he did not develop any resistance.  When asked if he had any medical evidence of lower CD4 count, he stated he only had his free world medical records before he was jailed at SCDC.  He testified he did not have any medical tests taken right after the two weeks where he was denied his HIV medication.  He testified the ADC found his count was lower and changed his medication.  When queried again as to the detrimental effects of the delay in receiving his medication, he agreed that, in his deposition, he testified the detrimental effects at the time were only emotional.  He stated that, at the time of the deposition, he did not know about the changes in his virus load and CD4 levels, and that he now had Hepatitis C.  Plaintiff testified the ADC changed his HIV medications, and his clinical levels have been improving.  When asked if his levels were returning to what they had been prior to his incarceration at SCDC, he testified that they were.  Plaintiff was asked to detail his physical injuries.  He stated Hepatitis C, pain from neuropathy with no pain medication, and damage to his knee for not being

6

treated or medicated.

Plaintiff was asked about his placement in the suicide cell.  When it was pointed out to him that Defendants argue it was not retaliatory, but in fact, at his own request and because he had been having violent thoughts towards himself and others, Plaintiff responded this was not true.  He pointed to his Exhibit 16.  (Doc. 73, p. 37)  He stated these kiosk grievances showed he was having violent thoughts towards others, not towards himself.  The entry in question is dated August 10, 2012, and states: "I HAVING BAD ANXIETY VIOLENT THOUGHTS NOTB TO ME OTHERS CANNOT SLEEP MND RACING THE FRENCHMAN GETTING BAD HELP PLEASE." (Docs. 66-6, p. 68; 73, p. 37)  When asked what this meant, Plaintiff testified this meant he was having a bad anxiety attack, and stated they moved him into the suicide cell five days later. Plaintiff testified he was having violent thoughts towards others, but he was in a cell by himself. Plaintiff testified he was never interviewed, he was just put in the suicide cell.  Plaintiff was asked if he saw any mental health professionals while at SCDC.  Plaintiff stated he saw former Defendant Tim Grant five or six days after being placed in the suicide cell.

Plaintiff was asked about any physical injury he might have sustained as a result of Defendant Moore's alleged denial of medical care.  He testified Hepatitis C, pain from neuropathy with no pain medication, and damage to his knee.  He did not mention his HIV viral load or his CD4 level.

Plaintiff was asked about his official capacity claims against the Defendants.  Plaintiff pointed to internal policies not being followed.  The Court explained official capacity claims, and asked again.  Plaintiff testified he was told that putting Ed Baker in to the cell was policy.  They stated policy permitted them to put more than one person into a suicide cell.  He also stated Defendants Devane and Hollenbeck were required to answer grievances by policy.

7

Plaintiff was asked about exhausting his administrative remedies. He testified he submitted nine pages of grievances prior to the Ed Baker incident. He testified he believed his grievances were why he was placed in the suicide cell. Plaintiff testified he did not submit a grievance about the Ed Baker incident. He stated he could not do so in the suicide cell and after that he was placed in the "hole." The Court queried Plaintiff if, at any point, he asked to file a grievance concerning the Ed Baker incident. Plaintiff testified he did not ask to file a grievance because he was so traumatized and afraid for his life that he did not want to file any more grievances. Plaintiff testified he did not file any grievances concerning the food service he received in the suicide cell. Plaintiff testified he did not file a grievance concerning the lack of mat or blanket in the suicide cell. He testified this was part of the policy, that suicide cell inmates received no blanket, mat, or eating utensils. He testified there was a rubber bench to sleep on in the cell.

Plaintiff confirmed that he asked to be placed in protective custody, to be housed separately, at the beginning of his incarceration at SCDC.

Defense counsel was given the opportunity to ask Plaintiff questions. Because Plaintiff testified to pain from neuropathy, he was asked if he was diabetic. Plaintiff testified he was not, but that neuropathy could come from other health issues. He did not specify what other health issues might cause neuropathy. He was asked if he complained of diabetes while incarcerated in SCDC. He testified he did not.

Plaintiff was asked if he received medication while he was in the suicide cell. Plaintiff testified he did eventually receive medication.

Plaintiff was asked again if he had any medical opinion from anyone that the two weeks without his HIV medication caused either a decrease in CD4 count or an increase in his viral load.

8

He testified he did not have any medical opinion to that effect because he had not had a chance to talk to a doctor.

When asked about Ed Baker, he said he had never seen him before.  When asked if he had any reason to believe Baker was a danger to him, he stated he did, because Baker was crying, bloody, and very emotional.

After the hearing, Plaintiff submitted a Motion to Submit New Information on June 27, 2016.  (Doc. 79)  He filed a Supplement to that Motion on July 7, 2016.  (Doc. 80)  Defendants filed a Response to this Motion and Supplement on July 22, 2016.  (Doc. 82)  The Response objects to the Motion and Supplement as untimely, and Defendants further note Plaintiff provided no reason for his failure to raise the information or arguments at the Summary Judgment hearing. They contend Plaintiff had not indicated that any other facts or evidence were necessary for the Court receive to decide the case.  Defendants ask the Court to strike Plaintiff's Motion and Supplement from the record.  As Plaintiff's Motion and Supplement were submitted after the hearing, and Plaintiff had already been permitted to supplement his Complaint numerous times prior to the hearing, Plaintiff's Motion to Submit New Information was denied.  (Doc. 84)  The Motion and Supplement were not considered for this Report.

## II.  LEGAL STANDARD

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[A] genuine issue of material fact exists if: (1) there is a dispute of fact; (2) the disputed fact is material to the outcome of the case; and (3) the dispute is genuine, that is, a reasonable jury could return a verdict for either party."  *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.,* 49 F.3d 399, 401 (8th Cir. 1995).  The moving party has the burden of showing the absence

of a genuine issue of material fact and that they are entitled to judgment as a matter of law, but the non-moving party may not rest upon mere denials or allegations in the pleadings and must set forth specific facts to raise a genuine issue for trial.  *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986).  The Court must view all evidence and inferences in a light most favorable to the nonmoving party.  *See McCleary v. ReliaStar Life Ins. Co.,* 682 F.3d 1116, 1119 (8th Cir. 2012).  However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## III.  DISCUSSION

Defendants note Plaintiff was first diagnosed with HIV in 1994, while incarcerated in the state mental hospital.  (Doc. 66, p. 2)  Defendants argue this case should be summarily dismissed for eight reasons: (1) Plaintiff has not alleged, and cannot prove, any personal involvement by Defendant Hollenbeck; (2) Plaintiff has not alleged, and cannot prove, any personal involvement by Defendant Devane; (3) Defendant Schuch had no knowledge of an excessive risk of harm to Plaintiff by Ed Baker; (4) Defendant Hayes was not deliberately indifferent to Plaintiff's medical needs; (5) Defendant Moore was not deliberately indifferent to Plaintiff's medical needs; (6) Plaintiff has not alleged any physical injury as a result of any of his claims, therefore he is barred from compensatory damages; (7) Plaintiff has not alleged facts to support any official capacity liability claims; and, (8) Plaintiff did not exhaust his administrative remedies concerning either the Ed Baker incident or the food served during his time in suicide watch.  (Doc. 65)

**A.  Plaintiff Failed to Exhaust His Administrative Remedies Concerning the Ed Baker Incident or Conditions in the Suicide Watch Cell**

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e, mandates exhaustion of available administrative remedies before an inmate files suit.  The PLRA provides: "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).

In *Jones v. Bock*, 549 U.S. 199 (2007), the Supreme Court concluded that "exhaustion is not *per se* inadequate simply because an individual later sued was not named in the grievances," leaving it to the court below to determine in the first instance the sufficiency of the exhaustion in these cases.  *Id*. at 219.  To properly exhaust administrative remedies, prisoners must "complete the administrative review process in accordance with the applicable procedural rules."  *Id.* at 218 (internal citation omitted).  The Court stated, "[t]he level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Id*.

The Eighth Circuit Court of Appeals recognizes only two exceptions to the PLRA exhaustion requirement: (1) when officials have prevented prisoners from utilizing the grievance procedures, or (2) when the officials themselves fail to comply with the grievance procedures.  *See Gibson v. Weber,* 431 F.3d 339, 341 (8th Cir. 2005) (citing *Miller v. Norris*, 347 F.3d 736 (8th Cir. 2001) (explaining that a prisoner is only required to exhaust those administrative remedies that are available and any remedies that prison officials prevent a prisoner from utilizing are not considered available)).

11

At the hearing, Plaintiff testified he did not submit any grievances concerning the Ed Baker incident, the quality of the food served in the suicide cell, or the lack of a mat and blanket in the suicide cell. He testified there was no kiosk to use for grievances in the suicide cell. When specifically asked by the Court if he had asked to file any grievances, Plaintiff testified he never asked anyone to file a grievance concerning the Ed Baker incident because he was traumatized and afraid for his life, and he did not want to file any more grievances. Plaintiff did not testify anyone at SCDC prevented him from filing grievances.

Plaintiff recovered fully from his trauma within 48 hours of leaving the suicide watch cell, going on to file 22 additional grievances at SCDC. In her affidavit, Defendant Moore stated Plaintiff was placed in the suicide cell on August 20, 2012, due to his statements of "violent thoughts" towards himself and others. (Doc. 66-4, p. 2) Notes on Plaintiff's kiosk request report dated August 21, 2012, indicate he was moved to have more observation. Plaintiff's kiosk entries stop on August 16 and 17, 2016, with his statements "I HAVING BAD ANXIETY VIOLENT THOUGHTS NOTB TO ME OTHERS CANNOT SLEEP MND RACING THE FRENCHMAN GETTING BAD HELP PLEASE" and "PLEASE NEED HELP." (Doc. 66-6, p. 68) Based on his suicide watch log, Plaintiff's last day in suicide watch was August 27, 2012. (Doc. 66-6, pp. 29-41) His grievances begin again on August 29, 2012, with "SIR I NEED TO MARRY HANNAH RHYNE SHE IS A INMATE HERE CAN YOU DO IT PLEASE THANK YOU GOD BLESS." (Doc. 66-6, p. 69) After this entry, Plaintiff filed another 21 kiosk entries between August 29, 2012, and October 7, 2012. These entries cover topics such as his request to marry, problems with his high protein tray, failure to receive a nighttime snack, failure to receive gravy on his potatoes, failure to receive dessert, requests for more Paxil, protests over medicine copays,

12

adding and removing people from his visitor list, access to a legal envelope, and a request for the "blue blanky" which does not make him itch.  (Doc. 66-6, pp. 69-74)

Based on Plaintiff's own testimony and exhibits, Plaintiff has not exhausted his administrative remedies concerning the Ed Baker incident, food in the suicide cell, and the lack of a mat and blanket in the suicide cell.  Nor has he made any allegations which might qualify him for an exception to the exhaustion requirement.  Accordingly, Plaintiff's claims for the Ed Baker incident, food in the suicide cell, and the lack of a mat and blanket should be dismissed.[2]

### B.  No Knowledge of Excessive Risk of Harm by Defendant Schuch Concerning Ed Baker Incident

It is technically not necessary to address this issue, as Plaintiff has not exhausted his administrative remedies regarding the Ed Baker incident.  Nonetheless, Plaintiff referred to Mr. Baker's booking sheet several times, and he submitted it to the Court for review.  For the sake of completeness, the Court will therefore discuss the booking sheet and other testimony concerning this incident.

Prison officials have a duty, under the Eighth Amendment, to protect prisoners from violence at the hands of other prisoners.  *See Perkins v. Grimes,* 161 F.3d 1127, 1129 (8th Cir. 1998).  Of course, not "every injury suffered by one prisoner at the hands of another . . . translates into constitutional liability for prison officials responsible for the victim's safety."  *Farmer v. Brennan,* 511 U.S. 825, 834 (1994).

---

[2] To the extent there may be concern that Plaintiff actually did contract Hepatitis C as a result of the Ed Baker incident, the Court notes two relevant facts concerning Plaintiff's criminal history.  Plaintiff was in custody in SCDC on a charge of knowingly exposing a person to the HIV virus because he engaged in unprotected sex on several occasions with the victim.  (Doc. 66-6, pp. 1, 7)  Prior charges against him include two charges of prostitution.  (Doc. 66-6, p. 7)

To prevail on his failure to protect claim, Plaintiff must satisfy a two prong test: (1) show he was "incarcerated under conditions posing a substantial risk of serious harm," and (2) show that prison officials were "deliberately indifferent [to his] health or safety." *See Holden v. Hirner,* 663 F.3d 336, 341 (8th Cir. 2011) (internal citations omitted).   The first prong is an objective requirement to ensure the deprivation is a violation of a constitutional right. *Id.*  The second, however, is subjective requiring Plaintiff show the official "both knew of and disregarded 'an excessive risk to inmate health or safety.'" *Id. (quoting Farmers,* 511 U.S. at 837).  "An official is deliberately indifferent if he or she actually knows of the substantial risk and fails to respond reasonably to it." *Young v. Selk,* 508 F.3d 868, 873 (8th Cir. 2007).   Negligence alone is insufficient to meet the second prong, instead, the official must "recklessly disregard a known, excessive risk of serious harm to the inmate." *Davis v. Oregon County,* 607 F.3d 543, 549 (8th Cir. 2010) (internal quotation marks and citation omitted).  Further, "[c]laims under the Eighth Amendment require a compensable injury to be greater than *de minimis*." *Irving v. Dormire*, 519 F.3d 441, 448 (8th Cir. 2008).

At the hearing, Plaintiff repeatedly referred to Ed Baker's booking sheet to indicate Defendant Devane and Schuch should have known Baker was a threat to him.  Plaintiff attached a copy of Mr. Baker's SCDC Suicide Prevention Screening Guideline sheet as his Exhibit 44.  (Doc. 73, p. 65-66)  In response to a question on line 6, where the sheet asks about Baker's drug or alcohol abuse history, a comment on line 5 notes "Oxy 12 yrs\methadone, morphine, Adavane clonapam." (Doc. 73, p. 65)  At line 9, where the sheet asks if the detainee is thinking about killing himself/herself, a comment notes "said if he could pay someone or in the pod let someone do it." (Doc. 73, p. 65).  At line 11, where the sheet asks if the detainee is expressing feelings of

hopelessness, a comment notes "in pain all the time."  (Doc. 73, p. 65)  At line 13, where the sheet asks about signs of depression, a note indicates "crying."  (Doc. 73, p. 66)  At line 16a and 16b, notations indicate detainee is on "severe pain killers" and is showing signs of depression.  Another notation lower on the sheet directs that he be placed in H-5 because he will have withdrawals. (Doc. 73, p. 66)

Nothing in this sheet indicates Mr. Baker was acting in a violent or hostile manner, that he was bloody, or that he was acting in a way which would raise any concerns about him being a threat to other inmates.

At the hearing, Plaintiff also pointed to language in his Exhibit 46 (Doc. 73, p. 67) that an inmate was "threatening cell mate" as proof to verify Baker was off the bench and threatening Plaintiff when the officers came to retrieve Baker.  This sheet was, in actuality, Plaintiff's suicide watch log sheet for August 26, 2012.  Thus, the language "threatening cell mate" actually indicates Plaintiff was threatening Ed Baker.

### C.  No *Respondeat Superior* Liability by Defendants Hollenbeck or Devane

A claim of deprivation of a constitutional right cannot be based on a *respondeat superior* theory of liability.  *See Monell v. Department of Social Services,* 436 U.S. 654, 694 (1978).  "[A] supervisor is not vicariously liable under 42 U.S.C. § 1983 for an employee's unconstitutional activity."  *White v. Holmes,*  21 F.3d 277, 280 (8th Cir. 1994); *see also Keeper*, 130 F.3d at 1314 ("general responsibility for supervising the operations of a prison is insufficient to establish the personal involvement required to support liability").  "Liability under section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights.  To establish personal liability of the supervisory defendants, [Plaintiff] must allege specific facts of personal involvement in, or direct responsibility for, a deprivation of his constitutional rights."  *Clemmons v. Armontrout,* 477

F.3d 962, 967 (8th Cir. 2007) (quoting *Mayorga v. Missouri,* 442 F.3d 1128, 1132 (8th Cir. 2006)). In other words, Defendants cannot be held liable merely because they hold supervisory position at the SCDC.

Plaintiff provided no testimony or evidence that either Defendant Hollenbeck or Devane had any personal involvement with any of his claims. Instead, he pointed to policies stating who is in charge of grievances and placement in the suicide cell. He testified Defendant Hollenbeck never personally answered any of his grievances. He pointed to the policy which states the Sheriff is to respond to grievances, and is responsible for jail policies, which he delegates. As to Defendant Devane, he testified as follows concerning the release of Ed Baker into the cell: "I can't say he ordered it, but I contend that he knew and approved of it through the policy. He was informed and did not stop it. He should have looked at my file and Baker's file. I was supposed to be kept separate." He further testified Devane was the supervisor on duty and was supposed to be notified if any threat of suicide existed.

Based on this testimony, Plaintiff sued Defendant Hollenbeck because he was the Sheriff, and Defendant Devane because he was the Supervisor on duty. This is a classic presentation of *respondeat superior* liability, and therefore, it cannot support any § 1983 claim.

### D. No Official Capacity Claims

Under Section 1983, a defendant may be sued in either his individual capacity, or in his official capacity, or in both. In *Gorman v. Bartch,* the Eighth Circuit Court of Appeals discussed the distinction between individual and official capacity suits. As explained in the *Gorman* case:

> Claims against government actors in their individual capacities differ from those in their official capacities as to the type of conduct that is actionable and as to the type of defense that is available. *See Hafer v. Melo,* 502 U.S. 21, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991). Claims against individuals in their official capacities are equivalent to claims against the entity for which they work; they require proof that

a policy or custom of the entity violated the plaintiff's rights, and the only type of immunity available is one belonging to the entity itself. *Id.* 502 U.S. at 24–27, 112 S.Ct. at 361–62 (1991). Personal capacity claims, on the other hand, are those which allege personal liability for individual actions by officials in the course of their duties; these claims do not require proof of any policy and qualified immunity may be raised as a defense. *Id.* 502 U.S. at 25–27, 112 S.Ct. at 362.

*Gorman,* 152 F.3d 907, 914 (8th Cir.1998). "[R]igorous standards of culpability and causation must be applied to ensure that the [county] is not held liable solely for the actions of its employee" in cases where a plaintiff claims a county has caused an employee to violate the plaintiff's constitutional rights. *Board of County Commissioners, Oklahoma v. Brown,* 520 U.S. 397, 405 (1997).

Plaintiff first testified his official capacity claims were supported by alleged violations of internal policy. The Court explained official capacity liability and repeated the question. Plaintiff testified putting Ed Baker into the cell was pursuant to SCDC policy, because more than one inmate was permitted in the suicide cell. He also testified Defendant Devane and Hollenbeck were required to answer grievances by policy.

Plaintiff has provide no allegations or proof which will support any official capacity claims.

### E.  No Deliberate Indifference to Medical Needs By Defendants Hayes and Moore

The Eighth Amendment prohibition of cruel and unusual punishment prohibits deliberate indifference to prisoners' serious medical needs. *Luckert v. Dodge County*, 684 F.3d 808, 817 (8th Cir. 2012). To prevail on his Eighth Amendment claim, Plaintiff must prove that Defendants acted with deliberate indifference to his serious medical needs. *Estelle v. Gamble,* 429 U.S. 97, 106 (1976).

The deliberate indifference standard includes "both an objective and a subjective component: 'The [Plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious

17

medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'" *Jolly v. Knudsen,* 205 F.3d 1094, 1096 (8th Cir. 2000) (quoting *Dulany v. Carnahan,* 132 F.3d 1234, 1239 (8th Cir. 1997)).

To show that he suffered from an objectively serious medical need Plaintiff must show he "has been diagnosed by a physician as requiring treatment" or has an injury "that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir. 2011) (internal quotations and citations omitted).

For the subjective prong of deliberate indifference, "the prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not give rise to the level of a constitutional violation." *Popoalii v. Correctional Med. Servs,* 512 F.3d 488, 499 (8th Cir. 2008) (internal citation omitted). "Deliberate indifference is akin to criminal recklessness, which demands more than negligent misconduct." *Id.*

It is well settled that a "prisoner's mere difference of opinion over matters of expert medical judgment or a course of medical treatment fail[s] to rise to the level of a constitutional violation." *Nelson v. Shuffman,* 603 F.3d 439, 449 (8th Cir. 2010) (internal quotation marks and citations omitted). An "inmate must clear a substantial evidentiary threshold to show the prison's medical staff deliberately disregarded the inmate's needs by administering inadequate treatment." *Id.* Despite this, issues of fact exist when there is a question of whether or not medical staff exercised independent medical judgment and whether the decisions made by medical staff fell so far below the reasonable standard of care as to constitute deliberate indifference. *See Smith v. Jenkins,* 919 F.2d 90, 93 (8th Cir. 1990).

Deliberate indifference may also be manifested by "prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble,* 429 U.S. 97, 104–05 (1976). However, the "Constitution does not require jailers to handle every medical complaint as quickly as each inmate might wish." *Jenkins v. County of Hennepin, Minn.,* 557 F.3d 628, 633 (8th Cir. 2009). The objective seriousness of delay in treatment must be measured by reference to the effect of delay, which must be shown by verifying medical evidence in the record. *Laughlin v. Schriro,* 430 F.3d 927, 929 (8th Cir. 2005). Unless, however, the need for medical attention is obvious to a layperson, in which case the plaintiff need not submit verifying medical evidence to show the detrimental effects of delay. *See Schaub,* 638 F.3d at 919 (citing *Roberson v. Bradshaw*, 198 F.3d 645, 648 (8th Cir. 1999); *Aswegan v. Henry,* 49 F.3d 461, 464 (8th Cir. 1995); *cf. Boyd v. Knox*, 47 F.3d 966, 969 (8th Cir. 1995) ("noting that a delay in treatment, coupled with knowledge that an inmate is suffering, can support a finding of an Eighth Amendment violation").

### 1. Defendant Hayes

Plaintiff testified his sole complaint against Defendant Hayes was Hayes' failure to prescribe pain medication for his neuropathy pain on September 14, 2012. Plaintiff testified Defendant Hayes prescribed Paxil for his anxiety, and continued his HIV medication, but did not prescribe any pain medication. He testified he did not get any pain medication until he was transferred to the ADC.

Plaintiff saw Defendant Hayes on September 14, 2012. A physician evaluation sheet for this examination includes a handwritten note indicating the inmate's complaint was "pain, anxiety." A handwritten notation indicated Paxil was prescribed. (Doc. 66-6, p. 77) Plaintiff did not complain of neuropathy or pain when booked into SCDC. (Doc. 66-1, p. 69) Plaintiff did not

complain of neuropathy or pain when he met with mental health provider Tim Grant on August 22, 2012.  (Doc. 66-1, p. 75)  Plaintiff complained of lack of medication for HIV, as well as anxiety and pain in his kiosk entries from August 11, 2012, to August 31, 2012.  Plaintiff's only kiosk entry which identifies his alleged pain and anxiety medications by name asks for Xanax and "Roxies."[3]  The response stated he could not have narcotics.  (Doc. 66-6, p. 66)  After August 31, 2012, Plaintiff made no further kiosk entries alleging pain.  (Doc. 66-6, pp. 66-74)  When Plaintiff's mother dropped off his medication on August 22, 2012, she dropped off HIV medications, but no medications for anxiety, pain, or neuropathy.  (Doc. 66-1, p. 76)

In his affidavit, Defendant Hayes stated he saw and physically examined Plaintiff on September 14, 2012.  (Doc. 66-3)  He stated Plaintiff complained of anxiety and said he was HIV-positive.  Defendant Hayes conducted a physical examination, and found "no appreciable disease meaning no acute distress, ambulatory . . . and he moved all extremities without distress."  He diagnosed anxiety disorder and prescribed Paxil.  He stated Plaintiff had no physical symptoms consistent with neuropathy and made no complaints of pain during the exam.   To his understanding, Plaintiff never had diabetes.  (Doc. 66-3, p. 2)  A printout from the SCDC medical maintenance log for this examination states: "WM here with C/O longstanding anxiety DO.  States he was taking Xanax prior to arrest.  States anxiety is worse now he is in jail.  Inmate on T[ru]vada and Sustiva.  Denies SI/HI.  Denies AH/VH/TH.  The cell makes him claustrophobic."  The exam

---

[3] This appears to be a reference to Roxicodone, an opioid analgesic. http://www.pdr.net/drug-summary/Roxicodone-oxycodone-hydrochloride-1007.3140 (last visited July 21, 2016).

narrative on the log diagnosed anxiety disorder, prescribed Paxil, and continued the Truvada and Sustiva.  (Doc. 66-6, p. 54-55)

In her affidavit, Defendant Moore stated she spoke with Plaintiff at the outset of his incarceration.  She stated Plaintiff did not express any pain on intake or on any of the intake medical forms and questionnaires.  She also stated Plaintiff had access to the non-prescription pain medications ibuprofen, naproxen, Tylenol, and aspirin during his incarceration at SCDC. Defendant Moore stated Plaintiff never asked her for any prescription pain relief.  (Doc. 66-4, p. 2)

Plaintiff submitted ADC medical records which included a diagnosis of neuropathy and prescriptions for Gabapentin and alpha lipoic acid.  These records were dated December 2, 2013 through May 2, 2014.  (Doc. 73, pp. 61-64)

Plaintiff's claim against Defendant Hayes for failing to treat his neuropathic pain fails at the first prong of the test because Plaintiff has not provided any objective evidence of neuropathy while in SCDC.  There is no evidence of a diagnosis of any neuropathy, diabetic or otherwise, in the record until after Plaintiff left SCDC.  Plaintiff did not complain of neuropathy on his SCDC intake documents.  Plaintiff's mother did not bring in any medications for neuropathy when contacted by SCDC.  Plaintiff did not complain of neuropathy in any of his 40 kiosk entries. Plaintiff did not complain of neuropathy or pain when he met with mental health provider Tim Grant.  There are no notations about neuropathy on any of the documents for his examination with Dr. Hayes.  Thus, there was no evidence that Plaintiff suffered from neuropathy as an objectively serious medical need while he was at SCDC.

Plaintiff's claim against Defendant Hayes for failure to treat a general complaint of pain also fails at the first prong of the test, because it does not appear that Defendant Hayes knew of

21

any general pain complaint. Plaintiff only complained of pain in his kiosk entries, always coupled with anxiety. He did not do so on his intake forms. He did not do so when he spoke with Tim Grant. His mother brought no prescription pain medications for him. He did not request pain medication from the nurse, Defendant Moore. There was a handwritten note indicating Plaintiff complained of "pain, anxiety" on the form. Based on the handwriting, it appears Defendant Hayes did not enter this notation on the form. Defendant Hayes found no physical reason for or evidence of pain in his examination, and Plaintiff did not complain of pain during the examination.

Even if the Court assumes Plaintiff had a valid general pain issue, Plaintiff's claim against Defendant Hayes for general pain fails at the second prong of the test. Based on his prescription of Paxil for Plaintiff's anxiety, Defendant Hayes did not actually disregard Plaintiff's alleged anxiety-related pain, particularly given that this was his first encounter with Plaintiff. The computer log for this examination noted Plaintiff complained of a longstanding anxiety disorder and had been prescribed Xanax in the past. Paroxetine (Paxil) was prescribed, and his HIV drugs were continued. It is well-established in the medical literature that pain is associated with anxiety and depression. "Some psychiatric medications also work as pain relievers" in these circumstances. http://www.health/harvard.edu/healthbeat/the-pain-anxiety-depression-connection (last visited July 21, 2016); *see also* http://www.merckmanuals.com/home/brain,-spinal-cord,-and-nerve-disorders/pain/psychologic-factors-that-contribute-to-pain (last visited July 21, 2016). Thus, it appears Defendant Hayes' diagnosis of anxiety disorder and prescription for Paxil fell within the reasonable standard of care for Plaintiff's general complaint of pain. Plaintiff also had access to the non-prescription pain medications ibuprofen, naproxen, Tylenol, and aspirin at all

22

times during his incarceration at SCDC.  That Plaintiff disagreed with these options and requested

Roxicodone is not actionable under § 1983.[4]

## 2.  Defendant Moore

Plaintiff alleges Defendant Moore denied him his HIV medication and had him put in the

suicide cell in retaliation for filing grievances.  Neither of these allegations is supported by the

evidence.

Plaintiff was booked into SCDC on August 9, 2012.  He began receiving his HIV medication

on August 23, 2012, 14 days after he was booked in.  (Doc. 66-1, p. 21)  On his SCDC intake form,

there is a notation indicating Plaintiff "refused to give next of kin info."  This is subsequently

crossed out, but no next of kin information is listed.  (Doc. 66-1, p. 60)  Responses to Plaintiff's

kiosk grievances about his medications indicate SCDC staff was trying to get his medication.

(Doc. 66-6, pp. 66-67)  Plaintiff subsequently gave his family information to a mental health

professional, Tim Grant, on August 22, 2012.  (Doc. 66-1, p. 75)  SCDC used this information to

contact Plaintiff's mother, who brought his HIV medications to SCDC on August 22, 2012.  (Doc.

66-1, p. 76)  Plaintiff started receiving his HIV medication on August 23, 2012.  (Doc. 66-1, p. 21)

Plaintiff saw Defendant Hayes on September 4, 2012, and Defendant Hayes continued his

prescriptions for his HIV medications at that time.  (Doc. 66-3)  Thus, the delay in receiving HIV

medication was due to Plaintiff's refusal to provide next of kin information.

Moreover, Plaintiff did not provide any objectively verifiable medical evidence showing he

suffered any lasting detrimental effect from the delay in receiving his HIV medication.  Plaintiff

---

[4] The Court notes Plaintiff did not receive Roxicodone at the ADC either.  In the records he submitted, he received Tylenol and ibuprofen for general pain.  He received alpha lipoic acid and gabapentin for neuropathy pain.  (Doc. 73, pp. 61-64)

23

testified in his deposition that the only detrimental effects he suffered as a result that two week delay were "emotional."  (Doc. 66-1, p. 42)  At the summary judgment hearing, he agreed that was true at the time of the deposition because he did not know about changes in his viral load and CD4 count.  He testified that you "get resistant to HIV medications if you don't take them," but also testified he did not develop resistance.  Plaintiff testified he found out at the ADC that there were changes in his viral load and CD4 count, and they changed his medications because of that.  He also found out he had Hepatitis C.  When asked if his viral load and CD4 count were back to what they had been prior to his incarceration in SCDC, Plaintiff testified they were.

Plaintiff's hearing testimony concerning his change in medications at the ADC, CD4 count, and viral load are contradicted by the record.  Plaintiff was transferred to the ADC on October 22, 2012.  (Doc. 66, p. 1)  Plaintiff supplied ADC medical records from 2013 and 2014.  (Doc. 73, pp. 61-64).  His deposition was held on October 29, 2014.  Thus, Plaintiff would have had access to his ADC medical records at the time of his deposition.  A review of his ADC records indicated he was still prescribed Sustiva and Truvada as of February 5, 2014.  (Doc. 73, p. 63)

Sustiva and Truvada are the same HIV medications he was taking at SCDC.  They are the same medication he was prescribed when he was initially diagnosed with HIV in the state mental hospital in 1994.  (Doc. 66, p. 2)  Based on this evidence, Plaintiff's HIV medications did not become ineffective for him as a result of the two week delay in receiving them in SCDC.  These same ADC records also indicate his RNA test for HIV was negative on March 11, 2014.  (Doc. 73, p. 62)  The notation "CD4 count is good" was noted on April 23, 2014.  (Doc. 73, p. 61) Plaintiff testified at his Summary Judgment hearing that his CD4 count and viral load were returning to pre-SCDC incarceration levels.  Thus, Plaintiff's own testimony and medical records

from the ADC contradict any claim of lasting detrimental effects from the two week delay in receiving his HIV medications.

Plaintiff's claim that Defendant Moore placed him in the suicide watch cell in retaliation for filing grievances is also contradicted by the record.  His testimony that he was placed in suicide watch due to his grievances is quite likely true, due to the tenor and substance of those kiosk entries.  A review of those entries by the Court revealed a disturbed individual who made a barely coherent statement about "violent thoughts" coupled with repeated pleas for help.  The Court can see no evidence of retaliation in Defendant Moore's decision to move Plaintiff to the suicide watch cell for his own safety in response to his grievances.

## IV.  CONCLUSION

For the foregoing reasons, I recommend Defendants' Motion for Summary Judgment (Doc. 64) be **GRANTED**, and that Plaintiff's Complaint be dismissed against all remaining parties with prejudice.

**The parties have fourteen (14) days from receipt of the Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 29th day of July, 2016.

/s/  Mark E. Ford
HON. MARK E. FORD
UNITED STATES MAGISTRATE JUDGE

25